**Samuel LEAL and Milchem, Inc., Appellants,**

v.

**Javier RAMIREZ et al., Appellees.**

**No. 16026.**

Court of Civil Appeals of Texas, San Antonio.

Dec. 20, 1978.

Rehearing Denied Jan. 24, 1979.

M. W. Meredith, Jr., William A. Abernethy, Meredith, Donnell & Edmonds, Corpus Christi, for appellants.

J. G. Hornberger, J. G. Hornberger, Jr., Laredo, for appellees.

## OPINION

CADENA, Chief Justice.

This is an appeal by defendants, Samuel Leal and Milchem, Inc., from an order of the district court of Webb County overruling their pleas of privileges. Leal is a resident of Jim Hogg County and Milchem, Inc., is a corporation which, for venue purposes, is a resident of Harris County. The only question before us is whether such defendants can properly be sued in Webb County under subdivision 9a of our general venue statute. Article 1995, Tex.Rev.Civ. Stat. (1964).

Plaintiffs are Eva Martinez Ramirez, who sues in her own right as the surviving widow of Romulo Israel Ramirez and as next friend of Javier Ramirez, Mary Agnes Ramirez, George Ramirez, and Rene Ramirez, surviving minor children of Romulo Israel Ramirez, to recover damages for the wrongful death of Romulo. The petition alleged that Romulo died as the result of injuries received in an accident involving a pickup truck being operated by Ramirez and a flatbed truck being operated by Leal who, at the time of such accident, was acting within the scope of his employment as an employee of defendant Milchem. The petition alleged several acts of negligence on the part of defendant Leal. It is undisputed that the accident occurred in Webb County.

In order to maintain venue in Webb County under subdivision 9a, plaintiffs had the burden of proving that Leal was guilty of negligence in Webb County; that, as far as Milchem is concerned, Leal, at the time he was negligent, was acting within the scope of his employment as the agent of Milchem; and that such negligence was the proximate cause of plaintiffs' injury. 1 R. McDonald, Texas Civil Practice § 4.17.2 (rev. 1965). It is undisputed that the accident occurred in Webb County; that, at the time of the accident, Leal was acting within the scope of his employment as an employee of Milchem; and that plaintiffs suffered damages as the result of the death of Romulo Israel Ramirez. Therefore, the only issue is whether the accident in question was proximately caused by the negligence of Leal.

This is the second appeal from an order overruling the defendants' pleas of privilege in this case. On the first appeal, this court reversed the order of the trial court because of a lack of evidence that plaintiffs had suffered any damage. Since the record revealed that on the date of the first hearing Mrs. Ramirez, widow of the deceased and mother of the minor plaintiffs, was ill and unable to appear in court, we concluded that the interests of justice required that the cause be remanded and declined to order that judgment be entered sustaining the defendants' pleas of privilege. *Leal v. Ramirez*, 553 S.W.2d 134 (Tex.Civ.App.— San Antonio 1977, writ dism'd).

On September 13, 1975, Leal was driving a flatbed truck proceeding in an easterly direction on Highway 359. Ramirez, driving a pickup truck, was proceeding in a westerly direction on the same highway. Highway 359 is a two-lane highway, and in this opinion the eastbound lane will be referred to as the "Leal lane," while the westbound lane will be identified as the "Ramirez lane." The vehicle operated by Leal will be referred to as the "flatbed," while the truck operated by Ramirez will be described as the "pickup."

At the time of the accident the highway was wet as the result of a drizzling rain. The collision occurred on the San Juanito Creek Bridge, about 17 miles east of the City of Laredo. Leal testified that after his vehicle had proceeded onto the bridge he saw the pickup for the first time as it was crossing the bridge about 50 or 75 yards away. According to Leal, when he first saw the pickup it "was coming along all right," but as it neared him it went out of control. Leal's testimony is somewhat confusing, since at one point his testimony indicates that the pickup was in Leal's lane when Leal first saw it, while at another point in his testimony he stated that the pickup was about 15 feet away when it swerved into the Leal lane. When he saw the pickup Leal applied his brakes and turned to the left, but was unable to avoid the collision. Throughout his testimony Leal was consistent in stating that at the time he first saw the pickup Leal was already about 15 feet onto the bridge.

At the time of the accident, Rene Diaz, Leal's nephew and fellow employee, was a passenger in the flatbed being operated by Leal. Diaz did not testify at the first venue hearing. Diaz said he saw the pickup for the first time when it was 50 to 75 yards away from the flatbed. At that time, the pickup was "zig-zagging" and was in Leal's lane. Diaz told his uncle to move the flatbed to one side, at which time Leal applied the brakes and turned the flatbed toward the left. The flatbed began to skid and went into the Ramirez lane. Diaz testified that he first saw the pickup when the flatbed was about 10 or 15 yards from the bridge, and that the pickup never moved back into its proper lane.

Pablo Vela was operating his vehicle in an easterly direction, some distance behind the flatbed at the time of the accident. In the car with him were his wife and their children. His wife was changing one of the children's diapers, and when Vela looked up, about 350 or 400 yards from the bridge, he saw the flatbed "going sideways," with the front end facing north, and at that time the front end of the flatbed was "about in the center" of the highway. At that time the flatbed was on the bridge. Since the flatbed was moving into the Ramirez, or westbound, lane and the front end of the flatbed was facing north, he could see over the flatbed which was not loaded, and he saw no oncoming traffic in the Leal lane. If there had been a pickup approaching him in the Leal lane Vela would have seen it. He did not see the pickup collide with the flatbed, but he saw the flatbed "make a fourth of a turn, facing towards Laredo [west], and on the north [westbound] lane . . . it stopped." When he arrived at the spot of the accident Leal told him, "I had a wreck." Vela then went to the pickup and, in the cab, he saw two men. One man was dead and the other, Ramirez, "was still alive, but barely." Vela also stated that when he arrived at the scene the rear of the flatbed's cab was on the center lane, and the pickup was in the Ramirez lane, facing west. He stated the point of impact was in the Ramirez lane.

The two state troopers who investigated the accident arrived at the scene at 2:50 p. m. At that time the flatbed had been moved completely off the bridge. Leal testified that he moved his truck because the bed portion was completely blocking the eastbound lane. Vela testified that the eastbound lane was not blocked, and that before Leal moved his truck he and other vehicles proceeding in an easterly direction encountered no problems in the eastbound lane.

Officer Garner testified that the flatbed left 120 feet of skid marks, beginning at a point west of the bridge, so that Leal had begun to apply his brakes before he entered the bridge. These marks indicated that the flatbed was partially in the Ramirez lane before the flatbed entered the bridge. The pickup left 61 feet of skid marks, all in the Leal lane. In Garner's opinion, the impact occurred at or near the center stripe. At the moment of impact, in his opinion, the pickup was completely in the Leal lane and the flatbed was in, or partially in, the Ramirez lane. At the time the flatbed began to skid, its left front wheel was on the center stripe. When Garner examined the

pickup he found two dead persons and four empty beer cans. There was the smell of alcohol in the cab and on the body of Ramirez. He testified that, in his opinion, Ramirez was intoxicated, although no blood tests, or any other test for intoxication, were made. According to Garner, the pickup went over into the wrong lane first. This opinion, he said, was based on the "physical evidence" and on what Leal and Diaz had told him. His opinion that Ramirez was intoxicated was based on the presence of the four empty beer cans, the smell of alcohol and the fact that the Ramirez truck was in the wrong lane, since he "could find no other reason to place him on the wrong side." He testified that he did not know which of the two persons in the pickup had been drinking beer.

As pointed out in our prior opinion, the presence of two dead persons and four empty beer cans in a vehicle is no evidence that the driver of the vehicle was intoxicated. *See* 553 S.W.2d at 137.

As far as the physical facts are concerned, they do not preclude or make unreasonable the conclusion that the flatbed crossed into the wrong lane first. Leal testified that he did not see the pickup until he had driven his flatbed onto the bridge, and that at that time the pickup "was coming along all right." The officer testified that if Leal was on the bridge when he first saw the pickup this fact would "blow" his theory which he said was based on the physical facts. It is clear from his testimony that the officer's theory was based primarily on the fact that the flatbed had begun to skid some distance from the bridge and that it was at least partially in the wrong lane before it went onto the bridge. If Leal's testimony is correct, then the flatbed had begun to skid and proceed toward the wrong lane before Leal saw the pickup.

The 61 feet of skid marks made by the pickup extended from near the center line arcing first in a southerly direction and then in a northerly direction back toward the Ramirez lane and the point of impact. The angle of the skid marks as depicted on the plat drawn by Officer Garner supports the conclusion that Ramirez had just pulled to his left across the center line and apparently had done so rather sharply just before he applied his brakes. This aspect of the testimony was pointed out in our prior opinion. 553 S.W.2d at 136.

At the second hearing, which culminated in the order from which this appeal is taken, Officer Garner testified that when he prepared the plat he "did not intend" to indicate that Ramirez had gone into the wrong lane at a point some 61 to 70 feet "from the point of impact." We assume that the plat is accurate, and, in the absence of evidence to the contrary, that it correctly reflects what he found at the scene. Reasonable inferences may be drawn from such facts whether the officer intended that such inferences be drawn or not.

Based on the physical facts and Leal's testimony that he did not see the pickup until he had driven his vehicle onto the bridge, it can reasonably be concluded that Leal began to swerve into the wrong lane before he saw the pickup. This conclusion is not made unreasonable by the opinion testimony of the officer, irrespective of what his intentions were as to the inferences he wished others to draw from the skid marks and the four empty beer cans.

Appellant stresses the fact that Diaz, Leal's nephew and fellow employee, did not testify at the first hearing. We agree that the testimony of Diaz, if believed, would support a judgment sustaining the pleas of privilege. The testimony of this witness may be described as "clear and positive," but it cannot be said that it is uncontradicted. It is directly contradicted by the testimony of Leal to the effect that he was already on the bridge when he first saw the pickup. Since, as the officer admitted, Leal's testimony on this point, if true, destroys the officer's "reconstruction" of the manner in which the accident occurred, it cannot be said that this conflict in the testimony of Leal and Diaz is insignificant. Simply stated, if the testimony of Diaz is correct, the officer's theory is persuasive. If Leal's testimony is correct, the officer's theory is untenable.

The judgment of the trial court is affirmed.